In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 16-2253

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ENKHCHIMEG ULZIIBAYAR "ENI" EDWARDS,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 CR 421-1 — **Richard A. Posner**, *Circuit Judge,*
sitting by designation.

_____

ARGUED MAY 17, 2017 — DECIDED AUGUST 24, 2017

_____

Before WOOD, *Chief Judge,* and MANION and HAMILTON,
*Circuit Judges.*

HAMILTON, *Circuit Judge.* Defendant-Appellant
Enkhchimeg Ulziibayar Edwards goes by the nickname Eni
Edwards. She was charged with two counts of witness tampering in violation of 18 U.S.C. § 1512(b)(3) (Counts I and II)
and two counts of making false statements on an official questionnaire for federal employment in violation of 18 U.S.C.

§ 1001(a)(2) (Counts III and IV). A jury convicted Edwards on all four counts. The trial judge, who was skeptical about both the strength of the government's evidence and whether the case merited criminal prosecution, imposed a below-guideline sentence of two years of probation and a $2,000 fine.

Edwards has appealed her convictions, raising three issues. She argues that the witness tampering statute, § 1512(b)(3), is void for vagueness. She also argues that the evidence was insufficient to support any of the four counts of conviction. We reject both of these arguments and affirm Edwards's false statement convictions, Counts III and IV.

We address first, though, Edwards's strongest argument, which is that the jury instructions for the witness tampering charges were faulty and that the error denied her a fair trial on Counts I and II. On that issue, we agree with Edwards. The trial judge refused both sides' request to instruct the jury on one essential element of the charges. As this case was framed under § 1512(b)(3), Edwards could be convicted only if she "corruptly" attempted to persuade another person to hinder, delay, or prevent communication of information to federal criminal investigators. The instructions given at trial failed to include the corruption element. They could have allowed the jury to convict Edwards of engaging in conduct that, under *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), did not constitute corrupt persuasion and therefore did not amount to criminal witness tampering. We cannot say this error was harmless, so we vacate Edwards's convictions on Counts I and II and remand for a possible new trial on those witness tampering counts, if the government opts to pursue them. We also vacate Edwards's sentence on all counts and remand for resentencing.

I.   *Factual Background and Procedural History*

To explain how this unusual prosecution came about, we first sketch Edwards's personal history and her history of government employment. Edwards is a naturalized United States citizen who emigrated from Mongolia in 1996. She applied in 2008 to become an officer with United States Customs and Border Protection (CBP). She was hired in 2009. Edwards went through a federal background investigation in 2009 and a reinvestigation in 2014.

To facilitate these investigations, Edwards was required to submit Standard Form 86, Questionnaire for National Security Positions (SF-86), and supplemental forms. The 2014 SF-86 required her to answer truthfully, among many other things, whether she "EVER provided financial support for any foreign national." Edwards answered no. A supplemental questionnaire asked Edwards in 2014 whether she "*ever* helped anyone enter or stay in the U.S. illegally." Again Edwards answered no. The government charged, and the jury found, that both answers were false. The path to those findings began more than fifteen years ago.

A.   *Tsasa Erdenekhuu and her Marriage to Michael Rosel*

Back in 2001, years before Eni Edwards applied to work for CBP, her Mongolian cousin Tsansanchimeg Erdenekhuu, known as "Tsasa" and sometimes as "Tasha," entered the United States on a student visa. Tsasa violated the terms of her visa and was eventually arrested by immigration authorities and placed in removal proceedings. Edwards posted a cash bond to secure Tsasa's release, using funds from Edwards's parents. Tsasa was released to Edwards's custody.

In early 2003, Edwards introduced Tsasa to her friend and co-worker, Michael Rosel. According to Rosel's later testimony at Edwards's 2016 trial, he saw Tsasa casually a couple of times. Edwards then surprised him by asking him to marry Tsasa so she could remain in the United States. Rosel testified that when Edwards floated the idea of a marriage, he had no romantic interest in the much younger Tsasa, and she had expressed no romantic interest in him. He also testified that he told Edwards he was concerned about the potential illegality of the arrangement, but that Edwards assured him he had nothing to worry about.

According to Rosel's testimony, Edwards badgered him over several months about marrying Tsasa. Eventually Rosel gave in. He and Tsasa were married in July 2003 in Las Vegas, Nevada. Shortly after the wedding, the couple applied for a "green card" for Tsasa to make her a lawful permanent resident of the United States as the spouse of a U.S. citizen. The marriage did not last long, though. Rosel abandoned the green card petition and the couple filed for divorce. In May 2004 the marriage was dissolved and Tsasa and Rosel went their separate ways.

B. *The Visa Fraud Investigation and the Focus on Edwards*

We now turn to a completely different episode, but the one that first led to the investigation of Edwards and ultimately to her criminal trial. In 2008, a Chicago-based organization called the American Mongolian Association (AMA) invited a group of Mongolian throat singers to perform at a cultural festival. Defendant Edwards had been volunteering with the organization, and many of the throat singers listed her contact information on their visa applications. Edwards communicated with the consular section at the United States embassy

in Ulaanbaatar, Mongolia. She identified herself as a vice president of the AMA and advocated for the applicants. Ultimately, the embassy official responsible for reviewing the petitions denied most of them. Based in part on his past experience with the AMA, the official believed the organization was attempting to facilitate visa fraud.

The embassy referred the matter to the Diplomatic Security Service, an investigative branch of the U.S. Department of State. In July 2012, Special Agent Douglas Miller got in touch with a contact at the Chicago office of CBP. That person introduced Miller to Edwards, who by that time was employed as a CBP officer at O'Hare International Airport. Unaware of Edwards's past involvement with the AMA, Miller asked her whether she was willing to help with the visa fraud investigation. Edwards agreed to help with English–Mongolian translation.

Some weeks later, just before a briefing with Edwards about the investigation, Special Agent Miller came across a file identifying Edwards as an AMA vice president. He was stunned. He later testified that "at no point in the investigation" had Edwards informed the agency about her involvement with the AMA. Edwards did not attend the briefing. The investigation moved forward, but the focus then shifted to Edwards herself.

Investigators acquired Edwards's bank records and discovered that she maintained a joint account with her cousin Tsasa. By reviewing Tsasa's immigration file, investigators learned of the 2003 marriage between Tsasa and Rosel, which Special Agent Miller described as having "significant indicators … for marriage fraud." Miller located Rosel and interviewed him. In what later became the focus of the witness

tampering charges in Counts I and II, Miller asked Rosel to call Edwards on a recorded line and to ask her questions that the investigators had prepared. Rosel reluctantly agreed. He made two such calls on January 8 and 9, 2013.

C. *The January 2013 Calls*

During the first call on January 8, Rosel told Edwards that State Department agents had contacted him and asked about Tsasa. Edwards did not immediately advise Rosel to cooperate fully. She advised Rosel to tell the agents that he and Tsasa "met at a common friend's party, we dated, we got married, it didn't work out … we got divorced, and I haven't … talked to her or met with her at all since then." Edwards repeated this advice many times in the 23-minute call. She added: "It's not like we're lying, you know, we didn't do anything … out of [the] ordinary. … Tell them … if I'm willing to answer I'll answer, if I'm not willing to answer I'm not gonna answer, I wanna talk to my lawyer." Edwards complained that she had become the target of the State Department investigation, a fact she attributed to her law-enforcement position at CBP and her Mongolian origins.

During the follow-up call on January 9, Rosel told Edwards that he had spoken with Special Agent Miller and that the investigators "seem to know an awful lot of information." Edwards repeated her advice from the previous call: "Tell them, hey, we legally got married, we are both adults, we had … mutual consent … we got divorced … . She didn't get nothing out of me, I didn't get nothing out of her. … We had a normal … relationship. Ups and downs. That's it." Rosel pressed Edwards, saying that "the truth was we got married so she wouldn't get deported and I got the sex out of it, I just don't wanna try to come up with a lie." Edwards did not take

the bait to confirm that the marriage was fraudulent or that any story to the contrary would be a lie. She replied: "In any relationship, when somebody's married or girlfriend/boyfriend, they have sex, okay, that's a normal, legal thing. … If you want them to go away, you need to keep it simple."

Rosel asked Edwards whether he should avoid mentioning her name to the investigators. Edwards said no: "No, it's fine, tell them, hey, Eni's my friend from my old job. … You don't have to lie about that because we worked together. … And [tell them] I think she brought [Tsasa] to one of our parties … and that's how we met." As the call ended, Edwards cautioned: "Don't let them intimidate you or try to put some stuff into your mouth. … Simple facts are simple facts, that's it, and the less you talk to them and the less time you spend with them [the] better for you, Mike."

At trial, Rosel testified that Edwards did not accurately describe the nature of his relationship with Tsasa during these recorded telephone conversations. He testified that if he had followed her advice and told investigators the relationship was normal, that would have been a lie. Rosel testified that Edwards was aware the marriage was a sham—that in fact she had arranged the marriage. However, he also admitted that he saw Tsasa on a few social occasions before their wedding, that the two had one romantic encounter, and that at the time of the marriage he hoped their relationship would evolve into something meaningful.

Edwards testified in her own defense. She cast Rosel's marriage to Tsasa in a very different light. Edwards said that she introduced Tsasa to Rosel, believing the connection would help Tsasa "lead a normal life here in this country." She hoped the relationship would evolve. She said that Rosel and Tsasa

"went out a couple of times" before their wedding and that the two had been intimate. She believed the couple had a sexual relationship, though Rosel had testified that they did not and that this was one of the reasons he and Tsasa agreed to end the marriage.

As explained below, one essential element of the witness tampering charges was that Edwards must have acted "corruptly" in trying to persuade Rosel how to answer questions from investigators. Edwards testified that she did not intend through the telephone conversations to pressure Rosel to change his story or to lie. Edwards said she felt she was "having [a] conversation with a friend, and … was trying to help him out." Under cross-examination, however, Edwards admitted that she asked Rosel to marry Tsasa so she could stay in the country legally.[1]

D.  *Procedural History*

The government charged Edwards in July 2014 with two counts of witness tampering in violation of 18 U.S.C. § 1512(b)(3) stemming from her statements to Rosel during their January 2013 phone conversations. The government later added two counts of false statements in violation of 18

---

[1] One can easily overstate the significance of this concession. We agree with the trial judge's explanation that a good-faith marriage motivated only *in part* by immigration benefits is not illegal: "Only 'a marriage entered into *solely* to obtain immigration benefits not otherwise available without the marriage has as its purpose the evasion of immigration laws.'" Dkt. No. 137 at 8, quoting *Eid v. Thompson*, 740 F.3d 118, 124 (3d Cir. 2014) (emphasis added in trial court order), and 8 U.S.C. § 1154(c) (an official finding that marriage was "entered into for the purpose of evading the immigration laws" results in lifetime bar on lawful entry into the United States).

U.S.C. § 1001(a)(2). Those latter counts were based on Edwards's 2014 SF-86 and supplemental questionnaire answers that she had never provided financial support for a foreign national and never helped anyone enter or stay illegally in the United States. The government viewed these statements as lies based on evidence that Edwards had supported Tsasa (a non-resident alien) financially and arranged Tsasa's marriage with Rosel.

Edwards moved to dismiss the witness tampering counts on the theory that the statute, § 1512(b)(3), is void for vagueness, both facially and as applied to Edwards. The district court denied that motion, and the case proceeded to trial. In February 2016, a jury convicted Edwards on all four counts. The court sentenced Edwards to serve two years of probation and to pay a $2,000 fine. Edwards appeals her convictions.

II. *Jury Instructions for Witness Tampering*

In her strongest argument on appeal, Edwards challenges the jury instructions for the witness tampering charges in Counts I and II. She argues that the instructions did not include or define the term "corruptly," which is an element of the charges. "We review *de novo* whether jury instructions accurately summarize the law, but give the district court substantial discretion to formulate the instructions provided that the instructions represent a complete and correct statement of the law." *United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014), quoting *United States v. Dickerson*, 705 F.3d 683, 688 (7th Cir. 2013).

As we noted recently, 18 U.S.C. § 1512 "defies easy summary." *United States v. Snyder*, 865 F.3d 490, — (7th Cir. 2017). The statute makes it a crime to obstruct a federal investigation

or prosecution in a wide variety of ways, ranging from corruptly trying to persuade a witness not to tell the truth up to and including murder.

Our focus here is § 1512(b)(3), which imposes criminal penalties on a person who "knowingly … corruptly persuades another person, or attempts to do so … with intent to … hinder, delay, or prevent the communication to a law enforcement officer … of information relating to the commission or possible commission of a Federal offense." The Supreme Court has explained that only persons "conscious of wrongdoing can be said to 'knowingly … corruptly persuad[e].'" *Arthur Andersen LLP v. United States*, 544 U.S. 696, 706 (2005) (reviewing conviction under 18 U.S.C. § 1512(b)(2)(A)–(B)). Similarly, the pattern criminal jury instructions developed for use in this circuit define "corruptly" as acting "with the purpose of wrongfully impeding the due administration of justice." See Committee on Federal Criminal Jury Instructions of the Seventh Circuit, Pattern Criminal Jury Instructions of the Seventh Circuit, at 453 (2012), http://www.ca7.uscourts.gov/pattern-jury-instructions/7th_criminal_jury_instr.pdf.

Pattern instructions are not necessarily authoritative. The instructions and their accompanying commentary are "approved in principle" by the Seventh Circuit Judicial Council, meaning that the Council has authorized their publication as an aid to judges and lawyers. But the Council has not approved (and, as an administrative body, could not approve) their use in any particular case. See *id*. at i; *United States v. Hill*, 252 F.3d 919, 922 (7th Cir. 2001) (pattern instructions offer "model instructions for occasions when they are appropriate but do[] not identify those occasions; the need for an instruction must be determined independently"); *United States v.*

*Doherty*, 969 F.2d 425, 429 (7th Cir. 1992) (pattern instructions, "while carrying some weight, were never intended to have the force of law in this Circuit").

Pattern instructions are not intended to be used mechanically and uncritically. Trial judges routinely decide to use different language tailored more closely to the particular case before them. Yet pattern instructions reflect the collective experience of the judges and lawyers who crafted them and can serve as a helpful starting point to ensure that essential elements of crimes and defenses are not overlooked.

In this case, the government proposed jury instructions that tracked the Seventh Circuit pattern instructions for witness tampering.[2] The trial judge rejected the proposed instructions during a pretrial conference because, in the judge's view,

---

[2] The pattern instruction states:

> [The indictment charges the defendant[s] with; Count[s] __ of the indictment charge[s] the defendant[s] with] obstruction of justice. In order for you to find [a; the] defendant guilty of this charge, the government must prove each of the [four] following elements beyond a reasonable doubt:
>
> 1. The defendant [[attempted to] [use[d] intimidation, threaten[ed] or corruptly persuade[d] another person]] or [engaged in misleading conduct toward another person]; and
>
> 2. The defendant acted knowingly; and
>
> 3. The defendant acted with the intent to hinder, delay or prevent the communication of information to [a law enforcement officer of the United States or judge of the United States]; and

they contained too much "legal jargon." With respect to the term "corruptly," the judge told the lawyers: "no one knows what 'corruptly' means. Then there's a definition, a person acts corruptly if he or she acts with the purpose of wrongfully impeding the due administration of justice. Well, that doesn't help. You don't need 'corruptly.'" Defense counsel protested that "by eliminating some of this technical language which has been approved by the Seventh Circuit … it will weaken the burden that the government must meet in a criminal case." The judge disagreed. In his view, omission of technical terms he deemed superfluous could not harm the defense

4. Such information related to the commission or possible commission of a [[federal offense] or [violation of conditions of probation], [supervised release], or [release pending judicial proceedings]].

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt [as to the charge you are considering], then you should find the defendant guilty [of that charge].

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt [as to the charge you are considering], then you should find the defendant not guilty [of that charge].

Pattern Criminal Jury Instructions of the Seventh Circuit at 447. The committee then advises: "The court should define 'corruptly' and 'misleading' when these terms are used in these instructions, using the pattern instructions set forth below." The pattern instructions then offer this definition: "A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice." *Id*. at 453.

"unless you're counting on obscurantism in leading [the jury] to acquit."

In the final instructions to the jury, the judge did not include the term "corruptly" or any comparable language. He gave the following instruction for the elements of the witness tampering offenses:

> Remember that you can find the defendant guilty only if the government proves the following four things beyond a reasonable doubt:
>
> 1. The defendant attempted to persuade another person to interfere with the government's investigation or prosecution of illegal activity;
>
> 2. She did this deliberately, knowing what she was doing rather than acting in ignorance or by mistake;
>
> 3. She intended to interfere with, delay, or prevent another person from giving information to a federal law enforcement officer;
>
> 4. That information related to a federal offense that someone had committed, may have committed, or was planning to commit.

To be sure, the final instructions required the jury to find that Edwards intentionally sought, through her conversation with Mike Rosel, to interfere with the State Department's investigation. But the instructions did not require the jury to find that Edwards acted *corruptly*. As in *Arthur Andersen*, they "simply failed to convey the requisite consciousness of wrongdoing." 544 U.S. at 706.

The Supreme Court explained the difference in *Arthur Andersen*, recognizing that certain forms of interference with an investigation are "not inherently malign." *Id*. at 704. "Consider, for instance," the Court wrote, "a mother who suggests to her son that he invoke his right against compelled self-incrimination, or a wife who persuades her husband not to disclose marital confidences. Nor is it necessarily corrupt for an attorney to 'persuad[e]' a client 'with intent to … cause' that client to 'withhold' documents from the Government." *Id*. (citations omitted).

The district court in *Arthur Andersen* had instructed the jury that it should convict the accounting firm of obstruction of justice in the investigation of the Enron Corporation collapse if it found that the firm "intended to 'subvert, undermine, or impede' governmental factfinding by suggesting to its employees that they enforce [a] document retention policy." *Id*. at 706. The instructions omitted any element of dishonesty, and the Court concluded that they were "flawed in important respects" and reversed the conviction. *Id*. at 708.

We have relied on *Arthur Andersen* to affirm an instruction that a defendant acted "corruptly" under § 1512 if he acted "wrongfully." *United States v. Matthews*, 505 F.3d 698, 706 (7th Cir. 2007). In *Matthews* we affirmed a conviction for obstruction of justice under § 1512(c), which also includes a "corruptly" element. We found the pattern instruction use of "wrongfully" was sufficient: "As explained in *Arthur Andersen*, under limited circumstances, a defendant is privileged to obstruct the prosecution of a crime. … By including the word 'wrongfully' in the definition of 'corruptly' and criminalizing only the act of 'wrongfully impeding the due administration

of justice,' the instructions directed the jury to convict only those who have no legal right to impede justice." *Id.*

Similarly, in *United States v. McKibbins*, 656 F.3d 707 (7th Cir. 2011), we affirmed an obstruction of justice conviction under § 1512(c) where the focus on appeal was the evidence the government used to prove the "corruptly" element. We explained: "The intent element is important here because the word 'corruptly' is what 'serves to separate criminal and innocent acts of obstruction.'" *Id.* at 711 (citation omitted); see also *United States v. Darif*, 446 F.3d 701, 711 (7th Cir. 2006) (affirming witness tampering conviction under § 1512(b)(1); jury instructions with statutory phrase "corruptly persuade" without further definition were sufficient under *Arthur Andersen*; instruction "adequately convey[ed] that the jury must find that Defendant acted dishonestly").

Following *Arthur Andersen*, courts have disagreed around the edges about just what does and does not count as corrupt persuasion, but there is no doubt that a knowingly corrupt *mens rea* (i.e., consciousness of wrongdoing) is an essential element of the § 1512(b)(3) offenses charged here in Counts I and II. See *United States v. Doss*, 630 F.3d 1181, 1186–90 (9th Cir. 2011) (comparing interpretations of § 1512 and *Arthur Andersen*). Some courts have suggested that an improper purpose, such as the intent to avoid criminal liability, may satisfy this requirement. Other courts require a more affirmative act of deception such as urging a witness to lie to investigators.[3]

---

[3] As *Doss* recounted, the Second and Eleventh Circuits have held that "that persuasion with an 'improper purpose' qualifies (such as self-interest in impeding an investigation)," while the Third and Ninth Circuits have held that "there must be something more inherently wrongful about the persuasion (such as bribery or encouraging someone to testify

Whatever the contours of the corrupt persuasion element, however, the error here was that the jury instructions did not say anything about wrongfulness at all: no reference to improper purpose, no requirement of deception, and no mention of conscious wrongdoing. The instructions left the door open for the jury to convict Edwards on the basis of innocent rather than corrupt persuasion. As the government acknowledged at oral argument, the instructions would not have permitted an attorney defending *Arthur Andersen*'s hypothetical mother who tells her son to invoke his Fifth Amendment privilege or wife who asks her husband to invoke the spousal privilege to argue that her client did not thereby violate the statute.

The fundamental rule when instructing a jury in a criminal case is that the instructions must identify for the jury all elements of the offense that must be proved beyond a reasonable doubt. See *Neder v. United States*, 527 U.S. 1, 6–8 (1999) (government conceded failure to instruct jury on essential element of materiality was constitutional error); see also *United States*

---

falsely)." 630 F.3d at 1186, 1189. Compare, e.g., *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996) ("The inclusion of the qualifying term 'corrupt[ ]' means that the government must prove that the defendant's attempts to persuade were motivated by an improper purpose."), and *United States v. Shotts*, 145 F.3d 1289, 1301 (11th Cir. 1998) (endorsing the reasoning of *Thompson*), with *United States v. Farrell*, 126 F.3d 484, 489 (3d Cir. 1997) ("[M]ore culpability is required for a statutory violation than that involved in the act of attempting to discourage disclosure in order to hinder an investigation"), and *Doss*, 630 F.3d at 1187-89 (endorsing the reasoning of *Farrell* and disapproving *Thompson* and *Shotts*). *Thompson* and *Shotts* predate *Arthur Andersen*, and while the Supreme Court did not expressly disapprove them, it is difficult to square their looser "improper purpose" standard with the *Arthur Andersen* emphasis on conscious wrongdoing and dishonesty.

*v. Gaudin*, 515 U.S. 506, 510 (1995) (Fifth and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt"); *Sullivan v. Louisiana*, 508 U.S. 275, 277–78 (1993) ("prosecution bears the burden of proving all elements of the offense charged, and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements") (citations omitted).

This need to instruct the jury on all elements of the offense applies even when the trial judge believes an element may be confusing, ambiguous, or difficult to describe in terms that jurors will understand. In such situations, the trial judge may find that pattern jury instructions are inadequate. That's fine: as noted above, pattern instructions are helpful resources, not holy writ. The trial judge is empowered to improve on the pattern language or even to start from scratch. But whether the judge uses a pattern instruction verbatim, adapts a pattern instruction to the specifics of the case, or drafts an instruction from scratch, the judge must ensure that the instructions convey each element of the charged crime. The instructions here did not. They failed to inform the jury about an essential element of the witness tampering charges—the corrupt mental state that distinguishes unlawful from innocent interference with an investigation.[4]

---

[4] To the extent the pattern instruction for the "corruptly" element of 18 U.S.C. § 1512 seemed inadequate to the trial judge, *Arthur Andersen* itself includes some amplifying language specific to the "knowingly … corruptly" phrasing in § 1512(b): "'Knowledge' and 'knowingly' are normally associated with awareness, understanding, or consciousness. 'Corrupt'

We therefore must vacate Edwards's convictions under Counts I and II unless the instruction error was "harmless beyond a reasonable doubt." *McDonnell v. United States*, 579 U.S. —, —, 136 S. Ct. 2355, 2375 (2016), quoting *Neder*, 527 U.S. at 16; accord, *United States v. Carter*, 695 F.3d 690, 696–97 (7th Cir. 2012); *United States v. Hatfield*, 591 F.3d 945, 951 (7th Cir. 2010); *United States v. Ramsey*, 406 F.3d 426, 432 (7th Cir. 2005).

We cannot treat this error as harmless. It's true that the government's evidence was legally sufficient to support guilty verdicts on Counts I and II, as we explain below. The jury might have disbelieved Edwards's testimony, believed Rosel's, and found that Edwards urged Rosel to lie to investigators. But the jury might also have believed Edwards's testimony and found that she believed she was advising Rosel to do nothing more than tell the truth without volunteering information. Under the instructions given in this case, a jury that believed Edwards could still have convicted her on the basis of that non-criminal intent.

At no point during the two January 2013 phone conversations (which together took nearly an hour) did Edwards admit that the marriage between Rosel and Tsasa was a sham, i.e., motivated solely to gain immigration benefits. Edwards insisted that the marriage had been normal: a wedding, a falling out, an amicable divorce. Perhaps Edwards was simply trying to control the narrative. Perhaps she suspected that Rosel might cooperate with authorities against her. Or perhaps

---

and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil. Joining these meanings together … makes sense both linguistically and in the statutory scheme. Only persons conscious of wrongdoing can be said to 'knowingly … corruptly persuade.'" *Arthur Andersen*, 544 U.S. at 705–06 (alterations and citations omitted).

she genuinely believed, as she testified, that Rosel and Tsasa had a real (albeit brief and disappointing) relationship. Perhaps she and Rosel both testified honestly about their very different recollections of and perspectives on the nature of Rosel's brief relationship with Tsasa, which had ended almost ten years before the telephone calls and thirteen years before trial. These are questions for properly instructed jurors, not judges. We are not privy to the jurors' deliberations, and the verdict form offers no clues.

In considering the harmless error issue, we must also note that the trial judge viewed the government's case on these counts as weak. The judge found only "with regret" that the evidence was legally sufficient to support conviction, and he did not think those counts should even have been charged. See Dkt. No. 137 at 9, 10 (also noting Rosel's credibility problems in characterizing relationship ten years earlier); Dkt. No. 157 at 51–52 (questioning whether Rosel–Tsasa marriage was a sham at the time they married, noting that no money had changed hands).

Under these circumstances, we cannot say beyond a reasonable doubt that a properly instructed jury would still have convicted Edwards for witness tampering. See *Neder*, 527 U.S. at 15, citing *Chapman v. California*, 386 U.S. 18, 24 (1967). Edwards is entitled to a new trial on Counts I and II.

III. *Vagueness Challenge*

Edwards also argues that the district court erred when it denied her motion to dismiss the witness tampering counts on vagueness grounds. We review *de novo* the district court's legal conclusion regarding the constitutionality of 18 U.S.C. § 1512(b)(3). See *United States v. Novak*, 841 F.3d 721, 726 (7th

Cir. 2016). We must consider this issue because if Edwards were correct, she could not be retried on those charges.

The crux of Edwards's argument is that the term "corruptly" in § 1512(b) is ambiguous and that the statute therefore "does not sufficiently define prohibited conduct." On this point, we agree with the trial judge's comment that the argument is a bit strange. After all, Edwards's challenge to the jury instructions for Counts I and II was based on the *absence* of "corruptly" or similar language in those instructions. However, no rule bars Edwards from arguing in the alternative both that the statute is unconstitutional and that if it is not, the instructions were flawed, so we turn to the merits of her vagueness argument.

We find no constitutional flaw. Edwards relies on *United States v. Poindexter*, 951 F.2d 369, 379 (D.C. Cir. 1991), which held the term "corruptly" was unconstitutionally vague where the defendant was prosecuted under 18 U.S.C. § 1505, which made it a crime to attempt to influence Congress "corruptly." The defendant in *Poindexter* was accused of lying to a Congressional committee. The discussion of the term "corruptly" in *Poindexter* does not undermine Edwards's convictions here for several reasons.

First, the *Poindexter* majority focused on the linguistic gymnastics needed to apply the phrase "corruptly . . . influences, obstructs, or impedes" a Congressional inquiry to a person's own false statements to Congress. 951 F.2d at 377–84. Even the *Poindexter* majority would have had no difficulty finding the term "corruptly" sufficiently clear as applied to a defendant's efforts to persuade someone else to lie to Congress. *Id*. at 379 ("Narrowing the transitive interpretation to include only 'corrupting' another person by influencing him

*to violate his legal duty* would both take account of the context in which the term 'corruptly' appears and avoid the vagueness inherent in words like 'immorally.'") (emphasis in original).

Second, *Poindexter* construed a different obstruction statute. In *Poindexter*, President Reagan's National Security Advisor during the Iran/Contra Affair was charged with, among other things, corruptly obstructing a congressional investigation by making false and misleading statements to Congress in violation of 18 U.S.C. § 1505. In reversing Poindexter's convictions, the court held that the term "corruptly" as used in § 1505 was "too vague to provide constitutionally adequate notice that it prohibits lying to the Congress." *Id*. at 379.

Based on the narrow reasoning used in *Poindexter*, other courts have cabined that vagueness holding to its unusual circumstances. E.g., *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) ("We … decline to extend *Poindexter* to another section of the obstruction-of-justice statutes. We continue to believe that *Poindexter* must be read narrowly, and not as a broad indictment of the use of 'corruptly' in the various obstruction-of-justice statutes."); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) ("The holding of unconstitutionality was closely tied to the alleged illegal conduct by Poindexter and the unique nature of § 1505."). The District of Columbia Circuit itself has limited the *Poindexter* holding in a way that supports application of § 1512(b)(3) here. In *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996), the court affirmed a witness tampering conviction under § 1512(b) where the defendant tried to persuade another person to lie in court. *Morrison* found this was an example of what *Poindexter* had called "transitive" corruption.

Third, *Poindexter* predated *Arthur Andersen*. The Supreme Court found in *Arthur Andersen* that the instructions in that case did not sufficiently inform the jury about the "corruptly" element, but the Court did not imply that the term was too vague.[5]

For these reasons, the term "corruptly" in § 1512(b)(3) is not unconstitutionally vague as applied to a person who tries to persuade another person to lie when the other person has a legal duty to tell the truth. While there may be some uncertainty around the edges of § 1512(b), as with many criminal statutes, all circuits that have considered the question have agreed that, "at a minimum, persuading a witness to affirmatively lie to investigators would violate § 1512(b)." *Doss*, 630 F.3d at 1186 (citation omitted); see also *United States v. Baldridge*, 559 F.3d 1126, 1142 (10th Cir. 2009) ("[A] non-coercive attempt to persuade a witness to lie to investigators constitutes a violation of § 1512(b). All circuits that have considered the issue have concluded likewise.") (citations omitted). Other circuits have also rejected the same vagueness argument that Edwards raises here. E.g., *Shotts*, 145 F.3d at 1301; *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996).

The government accused Edwards of pressuring Mike Rosel to lie to investigators about his relationship with Tsasa. Based largely on his testimony, a properly instructed jury could convict Edwards if it believed she acted dishonestly.

---

[5] *Poindexter* was superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459. As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505 "means acting with an improper purpose, *personally or by influencing another*, including making a false or misleading statement." (Emphasis added.)

While the corrupt-persuasion element might raise vagueness questions at the margins, the wrongdoing alleged here falls comfortably within the ambit of the statute. The statute is not unconstitutionally vague as applied to Edwards.

IV. *Sufficiency of the Evidence*

Finally, Edwards contends that the evidence introduced at trial was insufficient to support any of her four counts of conviction. "In a sufficiency of the evidence challenge, we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014), citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We neither reweigh evidence nor assess witness credibility. If there is a reasonable basis in the record supporting the verdict, then (absent other reversible error) the verdict must stand. *United States v. Moshiri*, 858 F.3d 1077, 1082 (7th Cir. 2017).

A. *Witness Tampering*

To convict Edwards under 18 U.S.C. § 1512(b)(3), the government had to prove that she "knowingly … corruptly" attempted to persuade another person with intent to "hinder, delay, or prevent" the communication of information relating to the "commission or possible commission" of a federal offense to a federal law enforcement officer. Mapping the facts of this case onto those statutory elements, the government had to prove that Edwards "knowingly … corruptly" attempted to persuade Mike Rosel to "hinder, delay, or prevent" the communication of information relating to the allegedly

fraudulent marriage between Rosel and Tsasa to State Department investigators. Even though the five-year statute of limitations had long since run on any possible prosecution of alleged marriage fraud itself, Rosel's information might have assisted the agents as they conducted their broader investigation into instances of Mongolian visa fraud and Edwards's involvement, if any, in such fraud.

As discussed above, while there is some disagreement among the circuits about the limits of conduct proscribed by § 1512(b)(3), all agree that persuading another person to lie to investigators violates the statute. The persuasion need not be explicit. We have recognized that corrupt persuasion may occur "where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it." *United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005) (citations omitted).

The government offered sufficient evidence to support the convictions under Counts I and II. The jury heard the two recorded phone calls that are the basis for the witness tampering charges. The jury also heard extensive testimony from Rosel and Edwards concerning the substance of those calls. The jury could have believed Edwards's account rather than Rosel's. Given the jury instruction error, for all we know the jury did believe Edwards's account. But the jury was also entitled to credit Rosel's testimony, which supports a finding that Edwards was urging him to lie about his relationship with Tsasa. If the case is retried on remand, a properly instructed jury could conclude that Edwards's persistent advice to Rosel— "Tell them hey, we dated, we got married, we lived together, it didn't work out, we got divorced, we did everything accordingly by law"—amounted to witness tampering in violation

of § 1512(b)(3) if she did not honestly believe that account and acted with a corrupt purpose.

B.  *False Statements*

To convict Edwards on Counts III and IV under 18 U.S.C. § 1001(a)(2), the government had to prove that she knowingly and willfully made materially false, fictitious, or fraudulent statements "within the jurisdiction of the executive … branch of the Government of the United States," that is, in connection with her CBP background investigations.

While the indictment described a number of statements Edwards made during the initial investigation and 2014 reinvestigation that could be deemed false, Counts III and IV focus on just two statements: Edwards's declaration on the 2014 SF-86 that she never provided financial support to a foreign national and her declaration on the 2014 supplemental questionnaire that she never helped anyone enter or stay in the United States illegally. The government introduced sufficient evidence for the jury to conclude that Edwards made these statements willfully and knowing that they were false.[6]

As for Count III, ample evidence supports the jury's conclusion that Edwards falsely denied providing financial support for a foreign national. In 2002, Edwards posted a $4,000

---

[6] The government also offered evidence that the statements were material. Joseph Westmoreland, director of the Personnel Security Division at CBP's Office of Internal Affairs, testified that CBP relies on truthful disclosures on background check forms (particularly with respect to questions about foreign contacts) in determining whether an applicant is suitable for employment. Truthful disclosures are especially critical for sworn CBP officers, who are expected to testify in court and who occupy positions potentially vulnerable to bribery and coercion.

cash bond to secure Tsasa's release from immigration deten-
tion, though Edwards testified that her parents helped supply
the funds. The bond was ultimately forfeited after Tsasa failed
to appear for deportation. Edwards also acknowledged that
Tsasa lived at Edwards's house in Des Plaines, Illinois, for one
or two months in 2002. On cross-examination, Edwards ad-
mitted that she provided Tsasa with food, shelter, and spend-
ing money during that period. Bank records show that Ed-
wards and Tsasa opened a joint account with survivorship
rights in 2008. A series of checks and deposit slips showed that
Tsasa paid $10,000 to Edwards in September 2008 and that Ed-
wards paid $3,000 to Tsasa in December 2008. (Edwards
claims she brought $10,000 in cash to Tsasa's mother in Mon-
golia to help finance a condominium and then brought the re-
maining $3,000 back to Tsasa.) The jury was not required to
find that Edwards knowingly and willfully falsified her SF-
86, but it heard sufficient evidence to support such a finding.

As for Count IV, the same evidence that would allow the
jury to convict Edwards for obstruction would allow it to con-
vict her for falsely stating that she never helped anyone enter
or stay in the country illegally. The jury could have believed
Mike Rosel's testimony that his marriage to Tsasa was a sham
and that Edwards was not only aware of but instrumental in
facilitating that sham for the purpose of securing a green card
for Tsasa. The government's case against Edwards was not a
slam dunk, but the *Jackson v. Virginia* standard is deferential.
See 443 U.S. at 319. The government introduced sufficient ev-
idence to show that Edwards violated 18 U.S.C. § 1001(a)(2).

V. *Resentencing*

Though we vacate only two of Edwards's four convictions,
the district court on remand should reconsider all terms of her

sentence, including the length of probation and the fine. The trial judge imposed a below-guideline sentence after finding under the Sentencing Guidelines a total offense level of 17 and a guideline range of 24 to 30 months in prison. The guideline calculation depended on the combination of all four crimes, see U.S.S.G. § 3D1.4, particularly since the witness tampering convictions were deemed the more serious crimes. If Edwards is not properly convicted of witness tampering, her total offense level would drop to 8. See U.S.S.G. § 3D1.3(a). With criminal history category I, the guideline range for a level 8 offense would be 0 to 6 months in prison.

Of course, the trial judge did not sentence Edwards to *any* prison term. The judge sentenced her to two years of probation on each of the four counts of conviction, to run concurrently, and a $2,000 fine plus the mandatory special assessments of $100 for each of the four felony convictions. Still, the district court on remand may conclude that a reduction in the length of probation or a decrease in the fine is appropriate given the substantial decrease in the guideline range if Edwards is not ultimately convicted by a properly instructed jury on Counts I and II. If nothing else, the special assessments of $400 would be cut in half if Edwards is not convicted of witness tampering.

\* \* \*

To summarize, then, we AFFIRM Edwards's convictions under Counts III and IV but VACATE Edwards's sentence on those counts and REMAND for resentencing. We VACATE Edwards's convictions and sentences under Counts I and II and REMAND for further proceedings consistent with this opinion.