**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4194**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CAROLYN J. EDLIND,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg. Michael F. Urbanski, Chief District Judge. (5:15-cr-00029-MFU-2)

Argued: January 30, 2018                                   Decided: April 10, 2018

Before NIEMEYER and TRAXLER, Circuit Judges, and SHEDD, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Shedd wrote the opinion in which Judge Niemeyer and Judge Traxler joined.

**ARGUED:** David Leroy Parker, DAVID L. PARKER, PC, Harrisonburg, Virginia, for Appellant. Heather Lynn Carlton, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Rick Mountcastle, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

SHEDD, Senior Circuit Judge:

A jury convicted Carolyn Edlind of witness tampering, conspiracy to commit witness tampering, and obstruction of justice. Edlind appeals, arguing that the evidence is insufficient to support her convictions. Because we conclude that a reasonable jury could have found that Edlind corruptly persuaded the witness to alter his testimony, we affirm.

I.

In 2014, a federal grand jury in the Western District of Virginia indicted Felix Adriano Chujoy and his mother, Maria McTague, for human trafficking, money laundering, and other offenses. *See United States v. Maria Rosalba Alvarado McTague et al.*, No. 5:14-CR-055 (filed Dec. 4, 2014) (the *Inca's Secret* case). The charges arose from their operation of Inca's Secret, a Peruvian restaurant in Harrisonburg, Virginia. Before trial, Chujoy was released with several conditions, including the condition that he refrain from contacting any witnesses or potential witnesses in the *Inca's Secret* case. His mother was released into the custody of Gary and Carolyn Edlind, close family friends of Chujoy and McTague. The families were so close that Chujoy called Edlind "tia" or "aunt."

After Chujoy's arrest, the Edlinds and several of Chujoy's close friends, including Christina Kang, Michael Kwiatkowski, and Donald Smith, formed a support group for him. The group met for meals at the Edlinds' home, and for "Taco Tuesdays" at a local restaurant. None of the friends were overly familiar with Inca's Secret or its operation. On one occasion, however, Kwiatkowski had joined Chujoy in transporting several restaurant employees and Chujoy told Kwiatkowski that the workers were all "illegal." (S.J.A. 734). Kwiatkowski, however, thought Chujoy was "joking." (S.J.A. 734).

2

During this time, federal agents began receiving reports from witnesses in the *Inca's Secret* case that McTague and Chujoy had been contacting them. Cell phone records revealed calls from McTague but not Chujoy. Instead, the records showed multiple calls to the witnesses from Chujoy's friends' phones, including phones belonging to Edlind and Kwiatkowski. During interviews with Kwiatkowski and Edlind, the agents learned that Chujoy frequently borrowed their phones to make calls. In light of this new information, the grand jury entered a superseding indictment charging Chujoy and McTague with witness tampering.[1]

After the issuance of the superseding indictment, Chujoy was arrested and detained. The Edlinds continued to attend and organize Taco Tuesdays with Kang and Kwiatkowski, but the meetings became more sporadic. Edlind, in particular, worried for Chujoy and became paranoid that the Government was investigating his friends. During the dinners, the friends would discuss the case, Chujoy's strange sense of humor, and his use of other peoples' phones. Edlind would ask Kang and Kwiatkowski not to bring their phones to the restaurant or to sit on them in case the Government was listening in on their conversations. Both Edlinds would also ask if Kwiatkowski or Kang had been contacted by the Government.

On March 25, the Edlinds invited Kwiatkowski and Kang to their house for dessert. During this event, Edlind asked everyone to leave their cell phones outside and then

---

[1] There is no evidence that either Edlind or Kwiatkowski contacted the *Inca's Secret* witnesses on these phones.

3

proceeded to "bash[]" Chujoy while also telling everyone that, if contacted by federal agents, they should "tell them that . . . we don't know anything because we don't know anything." (S.J.A. 741). Kwiatkowski found the statement "strange." (S.J.A. 742).

Meanwhile, Chujoy remained in pretrial detention. During his detention, he repeatedly called Edlind and Smith. Edlind visited nine times, and on other occasions was seen standing outside the jail blowing kisses to someone inside. Chujoy put Kwiatkowski on his visitor list and asked him to come, but Kwiatkowski did not do so. Chujoy also made calls, primarily to Smith and another friend, Yuri Jung, using another inmate's personal identification number, prodding them to get Kwiatkowski to visit.[2]

Finally, with the *Inca's Secret* trial only several weeks away, Chujoy sent a letter to Edlind on June 3, 2015:

> I'm going to keep this very short in hopes that it reaches you by or before saturday. I met w[ith] my attorney yesterday [and] he read me Mike Kwiatkowski's interview w[ith] the feds. I'm pretty shocked by what it says, so I'm hoping that it is either a big misunderstanding or that the feds are twisting it around. The interview says that according to Mike, my mom was very intimidating, that I can't be trusted, and that I'm always lying and making up stories. It goes on into more specific stories and examples that made me laugh, as I realized that Mike really is as dumb as a door knob, as he obviously could not understand/differentiate when I was joking and when I was being serious. His entire testimony/interview reminded me of a big misunderstanding that we (Mike, Christina [Kang] & I) had over a joke, when I told Christina that he was mildly retarded.
>
> Please make sure to meet with both of them so that Mike understands that much of the information he gave out is *incorrect* and could lead into me getting into a *huge* problem. Be nice to him about it, as I wouldn't want to offend him or have him take things personal. I understand that my jokes are

---

[2] Chujoy always had sufficient funds in his inmate account to make the calls using his own identification number.

4

sometimes stupid [and] between that [and] him not being able to tell when I was joking or not, his comments/interview are ludicrous.

I hope you get to meet w[ith] them ASAP, as clarifying all this is pretty crucial.

* * * *

P.S. He should probably also clarify that we didn't really start hanging out, until half way through 2014, as that would probably explain why we were always on two different pages [and] why he didn't really know much about me, or why he couldn't tell when I was joking.

(J.A. 281-82).

After receiving Chujoy's June 3 letter, Edlind visited him at the jail on June 6. Later that day, she sent a text to Kwiatkowski and Kang: "Very important we meet this week!!!!please contact me if you can't do Tuesday." (S.J.A. 1069). Kang said she preferred to talk over the phone, and Kwiatkowski texted the group that they "probably shouldn't be talking about" something that could not be discussed over text. (S.J.A. 1071). Edlind responded, "not on the phone you know why," (S.J.A. 1071), and "phones in the car will be fine like we have in the past," (S.J.A. 1072). She then texted, "you guys opt out I'll tell Felix don't worry about it I don't need to stress either." (S.J.A. 1073). Kang did opt out, but Kwiatkowski agreed to meet for Taco Tuesday at El Charro. Unbeknownst to Edlind, however, Kwiatkowski contacted government agents and wore a recording device for the dinner.

When Kwiatkowski arrived at El Charro, the Edlinds told him to sit on his phone before Edlind told him he could put it outside in her bicycle basket. Edlind admitted to Kwiatkowski that Chujoy had asked her to contact Kwiatkowski and "[t]ell him not to say anything, don't write anymore, do nothing." (J.A. 233). She also brought up the teasing incident referenced in Chujoy's letter, before asking "He told you back in November or

5

something that he murdered somebody? . . . He told you that and you believed it?" (J.A. 234-35). She then asked, "did [ICE] ask you . . . about him murdering anybody" (J.A. 235), and referenced Chujoy's odd sense of humor.

When the three began discussing the human trafficking charges against Chujoy and McTague, Kwiatkowski mentioned that Chujoy was a manager at the restaurant. Edlind quickly corrected him, explaining, "[h]e isn't the manager," and that "[y]ou know when you go apply for a job and say managed a restaurant, and he used that." (J.A. 253). She followed up by explaining that she also volunteered to help at the restaurant in a similar capacity and thus also considered herself a manager there, a fact she had shared with the Government.

The three also discussed the earlier allegations of witness tampering in the *Inca's Secret* case, prompting Edlind to offer, "I think they trapped [McTague]," (J.A. 263) and "I think it was a setup," (J.A. 264). Throughout the dinner, Edlind also opined on the reputations of Chujoy and McTague as untruthful people, mentioning "[t]hey've been lying for so long that they can do that. It's an art form," and that the whole case against them was "a game, but also lying, they're good at it," (J.A. 262).

Turning to Kwiatkowski's upcoming testimony and subpoena, Edlind advised him, "[d]on't go into detail if you're not asked to" (J.A. 271). She further suggested that he not meet with the prosecutors to go over his testimony prior to trial, explaining, "[t]hey're just offering it to you like that's a gift. I don't think so. Waste more of my time." (J.A. 272-73). To that end, she told Kwiatkowski that she "cooperated with them. I didn't have to. We

6

did," but that another friend, "did the same thing," but the Government "tricked her. . . . [t]hey ended up staying over an hour. She was so upset." (J.A. 273).

The Edlinds concluded the dinner by telling Kwiatkowski to obey the subpoena and appear at trial, and engaging in the following exchange:

> **Ms. Edlind**: Now the lawyers haven't talked to you yet? You haven't had that time?
> **Kwiatkowski**: No, no, no one has talked to me except for Homeland.
> **Ms. Edlind**: That goes very easy. They said don't feel, if they're asking you questions and if you answer them honestly yes or no, don't go into detail if you're not asked to.
> **Mr. Edlind**: Don't say if I answer, think in your mind if I answer this way that will be bad against Felix.
> **Ms. Edlind**: Or the lawyers.
> **Mr. Edlind**: Can I talk now?
> **Ms. Edlind**: Yeah. Yeah. Sorry.
> **Mr. Edlind**: Be quiet. You're thinking well let's see, what do they want to hear. If I say this, that will be bad for Felix, but if I say this over here it's really true but it's, you know. Don't do that.
> **Ms. Edlind**: Just tell the truth. The lawyers will take care of it.
> **Mr. Edlind**: Just tell the truth straight out on the line.
> **Kwiatkowski**: Right.
> **Mr. Edlind**: And if you happen to say something that's bad against Felix, that's their job to undo that.
> **Kwiatkowski**: Okay.
> **Ms. Edlind**: They fix that . . .
> **Mr. Edlind**: Their job is to fix it . . .
> **Ms. Edlind**: . . . the lawyer
> **Mr. Edlind**: . . . not your job, her job, my job.

(J.A. 271).

After this exchange, they turned back to discussing the case, and Edlind's husband mentioned that "[t]hey've got a lot of evidence" and that some was "superficial" "but some of it's probably real." (J.A. 274). After a brief discussion of money laundering, Edlind

7

interjected, "none of this stuff is for us. I mean, you, me, anybody else," because "[w]e're not on trial." (J.A. 275).

The *Inca's Secret* trial was delayed and did not start the following week. Chujoy was released on bond. Soon after his release, Chujoy began texting Kwiatkowski and tried to meet with him at several parties. Kwiatkowski repeatedly rebuffed Chujoy's efforts and told him to leave him alone until after the trial. Chujoy texted that he "completely underst[ood]," but that "I haven't really texted you or anything though, at least not to my knowledge. Lol." (S.J.A. 1084). During the continuance, agents again began investigating Chujoy's contact with witnesses. As part of that investigation, Edlind testified before the grand jury and denied that Chujoy ever asked her to contact anyone on his behalf. Edlind also voluntarily handed over Chujoy's June 3 letter.

Based on the foregoing, Edlind and Chujoy were charged in a five-count indictment with conspiracy to witness tamper (Count 1), in violation of 18 U.S.C. § 1512(k); witness tampering (Count 2), in violation of 18 U.S.C. § 1512(b)(1); obstruction of justice by attempting to influence Kwiatkowski's testimony (Count 3), in violation of 18 U.S.C. § 1503; perjury (Count 4), in violation of 18 U.S.C. § 1623; and obstruction of justice by false grand jury testimony (Count 5), in violation of 18 U.S.C. § 1503. Counts IV and V charged only Edlind.

At trial, Kwiatkowski testified that Edlind did not threaten, intimidate, mislead, or lie to him during the June 16 dinner. Edlind testified in her own defense that she did not intend to influence Kwiatkowski's testimony and that she believed Chujoy wanted her to "make sure that [Kwiatkowski] knew what the truth was." (S.J.A. 812). Regarding the

8

phone subterfuge, she testified that she was "very paranoid" and afraid she would be the next person arrested. (J.A. 809). She admitted to knowing that Chujoy was not supposed to contact witnesses.

At the close of the Government's case, Edlind moved for acquittal under Rule 29. The court reserved the motion, and the jury convicted Edlind on all five counts. Edlind renewed her motion of acquittal. In a lengthy published opinion, the district court granted the motion as to Counts IV and V (the grand jury obstruction and perjury counts) but denied it as to Counts I through III (the witness tampering and obstruction counts). *United States v. Chujoy*, 207 F.Supp.3d 626 (W.D. Va. 2016). The court later sentenced Edlind to two years of probation, six months of home confinement, 200 hours of community service, and a fine.

## II.

Rule 29 provides, in relevant part, that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). We review the denial of a Rule 29 motion *de novo*, "and we must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to support it." *United States v. Bran*, 776 F.3d 276, 279 (4th Cir. 2015). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* A defendant bringing a sufficiency challenge "must overcome a heavy burden," *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995), and reversal for insufficiency must "be confined to cases where the prosecution's failure is clear," *Burks*

9

*v. United States*, 437 U.S. 1, 17 (1978). "[B]ecause it is the jury's job to determine what the defendant actually did, knew, and intended, we will conclude that the evidence was sufficient to sustain the conviction as long as a rational jury, making permissible inferences, could find beyond a reasonable doubt that the elements of the counts were satisfied." *United States v. Byrne*, 435 F.3d 16, 22 (1st Cir. 2006). Edlind challenges her convictions for witness tampering, conspiracy to commit witness tampering, and obstruction of justice. We address each in turn.

A.

Section 1512(b)(1) makes it a crime to (1) knowingly (2) use intimidation, threats, or corrupt persuasion or engage in misleading conduct toward another (3) with the intent to influence, delay, or prevent the (4) testimony of that person in an official proceeding. 18 U.S.C. § 1512(b)(1). By statute, it is an affirmative defense "as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully." 18 U.S.C. § 1512(e).

By the time of the June 2015 dinner at El Charro, Edlind knew that Kwiatkowski was a potential witness in Chujoy's trial, and she also does not challenge her intent to influence on appeal, admitting that she was attempting "to correct incomplete or inaccurate statements so that Kwiatkowski would tell the truth." (Appellant's Br. at 15). Accordingly, her sufficiency of the evidence challenge focuses on whether she knowingly used intimidation, threats, or corrupt persuasion toward Kwiatkowski. The Government

10

contends that it introduced sufficient evidence that Edlind used corrupt persuasion toward Kwiatkowski. We agree.

To convict Edlind under § 1512, the Government had to prove not only that she used persuasion toward Kwiatkowski, but that the persuasion was corrupt, because "the word 'corruptly' is what serves to separate criminal and innocent acts of" influence. *United States v. Edwards*, 869 F.3d 490, 498-99 (7th Cir. 2017). "[P]ersuasion," the Supreme Court has explained, is by itself "innocuous" and "not inherently malign." *Arthur Andersen, LLP v. United States*, 544 U.S. 696, 703-04. (2005). "Consider, for instance," the *Arthur Andersen* Court wrote, "a mother who suggests to her son that he invoke his right against compelled self-incrimination, or a wife who persuades her husband not to disclose marital confidences. Nor is it necessarily corrupt for an attorney to 'persuad[e]' a client 'with intent to . . . cause' that client to 'withhold' documents from the Government." *Id.* at 704 (citations omitted).

To be criminal, then, the Court explained that the persuasion must be corrupt and extend to "persons conscious of wrongdoing," that is, persons acting with "wrongful, immoral, depraved, or evil" intent. *Id.* at 705-06; *see also Edwards*, 869 F.3d at 498 (finding that "corruptly" is synonymous with "wrongfully"). In *Arthur Andersen*, the district court instructed the jury that it could convict an accounting firm of obstruction of justice upon a finding that the firm "intended to 'subvert, undermine, or impede' governmental factfinding by suggesting to its employees that they enforce [a] document retention policy." *Arthur Andersen*, 544 U.S. at 706. This instruction, the Court explained, was "flawed in important respects," because it allowed for a conviction even absent a

11

showing of dishonesty. *Id.* at 708. In concluding that this erroneous instruction required reversal of the conviction, the Court noted that it was not "explor[ing]" the "outer limits" of corrupt persuasion. *Id.* at 706.

Prior to, and in light of, *Arthur Andersen*, lower courts have parsed the phrase "corrupt persuasion," searching for its outer limits.[3] There is general agreement that it does not require "acts, threats, emotional appeals, or persistent pleading," *United States v. Sparks*, 791 F.3d 1188, 1192 (10th Cir. 2015), but does require the Government to prove "a defendant's action was done voluntarily and intentionally to bring about false or misleading testimony . . . with the hope or expectation of some benefit to the defendant," *id.* at 1191. A defendant's directive to a witness to lie to investigators or at trial always suffices. *Id.* at 1192; *see also United States v. Bedoy*, 827 F.3d 495, 510 (5th Cir. 2016) (sufficient evidence when defendant suggested that witness misrepresent their relationship); *United States v. Burns*, 298 F.3d 523, 540 (6th Cir. 2002) (sufficient evidence when defendant told witness to lie to grand jury about defendant's drug dealing).

---

[3] "Some courts have suggested that an improper purpose, such as the intent to avoid criminal liability, may satisfy [the corrupt] requirement. Other courts require a more affirmative act of deception such as urging a witness to lie to investigators." *Edwards*, 869 F.3d at 499; *see also United States v. Doss*, 630 F.3d 1181, 1186–90 (9th Cir. 2011) (discussing differing interpretations of § 1512 after *Arthur Andersen*). We do not have to determine which approach is correct in this case, because, at Edlind's request, the jury was instructed that it could convict only if she "acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice," and was "conscious of wrongdoing." (S.J.A. 916). The jury was further instructed that "[m]erely persuading a person to withhold testimony in an official proceeding is not witness tampering or obstruction of justice." (S.J.A. 916).

12

Against this backdrop, we conclude that a reasonable jury could have found that Edlind knowingly corruptly persuaded Kwiatkowski. To begin, there is significant circumstantial evidence that Edlind was conscious of her wrongdoing. Days after receiving Chujoy's letter, Edlind visited him in jail. At the end of that meeting, she immediately texted Kang and Kwiatkowski in an effort to meet with them, admitting that it was at Chujoy's urging. She refused to discuss her "important" information over the phone because of her belief that the phones were being monitored by federal agents. During the dinner at El Charro, she had Kwiatkowski put his phone outside. All of these surreptitious acts occurred more than two months after Chujoy was remanded into custody, but less than two weeks before the *Inca's Secret* trial. *See Sparks*, 791 F.3d at 1193 (finding that the fact that defendant's statements came "three weeks" before a witness' "scheduled testimony" was evidence of corrupt persuasion). In particular, the "frenzied chain reaction of events caused by Kwiatkowski's interview with federal agents," is strong circumstantial evidence of Edlind's guilt. *Chujoy*, 207 F.Supp.3d at 648.

In addition to this circumstantial evidence, there is direct evidence of Edlind's wrongful persuasion in the form of her statements at the El Charro dinner. Edlind admitted that she was meeting with Kwiatkowski at Chujoy's request and focused her conversation on Chujoy's odd sense of humor and Kwiatkowski's gullible nature and inability to determine when Chujoy was lying. This line of discussion is lifted almost verbatim from Chujoy's letter. Edlind also minimized Chujoy's role in Inca's Secret, correcting Kwiatkowski's belief that Chujoy was a manager and opining that he and his mother were entrapped on the earlier witness tampering charges. Edlind contends that she was just trying

13

to tell Kwiatkowski the truth and not urging him to lie; however, the persuasion "need not be explicit" to be corrupt. *Edwards*, 869 F.3d at 503.

Indeed, corrupt persuasion includes situations where a defendant coaches or reminds witnesses by planting misleading facts. *United States v. LaShay*, 417 F.3d 715, 719 (7th Cir. 2005) (sufficient evidence of witness tampering when defendant reminded witness of a false fact because it was an "unstated invitation to lie"); *see also United States v. Gabriel*, 125 F.3d 89, 102 (2d. Cir. 1997) (Corrupt persuasion exists "where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it") (internal quotation marks omitted), *overruled in part on other grounds*, *United States v. Quattrone*, 441 F.3d 153, 176 (2d Cir. 2006). This tenet holds "true even though the evidence at trial never established that [Edlind's] account" of Chujoy's character or role at the restaurant was "false." *LaShay*, 417 F.3d at 719. The relevant fact is that Edlind "placed a story before" Kwiatkowski, which was that Chujoy was lying to Kwiatkowski and telling him tall tales to take advantage of his gullibility, and that she did so "in the hopes that [Kwiatkowski] would adopt [the story] if interviewed." *Id.* at 718; *see also United States v. Davis*, 854 F.3d 1276, 1282 (11th Cir. 2017) (finding sufficient evidence of corrupt persuasion when defendant told daughter "I think you old enough to understand the decisions that you make and the stuff that come out your mouth . . . You know, I'll be old when I get out just by you saying what you just said, which is not true" [*sic*]).

For instance, in *Bedoy*, authorities were investigating allegations that a police officer (Bedoy) was tipping off an informant about upcoming police actions in exchange for sexual

14

favors. Bedoy made several calls to the informant in which he told her "if someone were ever to ask . . . Hey, if 'What's your relationship with me?' . . . 'It's someone I've help[ed] 'em with . . . his cases.' That's it" *Bedoy*, 827 F.3d at 510. He also told her to not open the door for anyone, to leave town, and to give a fake name if she was pulled over by police. Bedoy also reminded her that she had the right not to talk to federal agents. Rejecting a sufficiency challenge, the Fifth Circuit explained "a rational jury could conclude that Bedoy did more than innocently advise [the informant] of her constitutional rights." *Id.* Bedoy's advice crossed into corrupt persuasion because he "instruct[ed]" the informant "to misrepresent their relationship to conceal any wrongdoing on his part," and to "lie about the illicit aspects of their relationship if asked." *Id.*

Like in *Bedoy* and *LaShay*, a jury could find that Edlind's comments during the El Charro dinner were attempts to plant a false story with Kwiatkowski in order to undermine his testimony against Chujoy. She minimized Chujoy's role in the operation of Inca's Secret, and her constant suggestions that Kwiatkowski did not understand when Chujoy was joking or lying could have led Kwiatkowski to reconsider whether Chujoy was telling the truth when, for instance, Chujoy told Kwiatkowski they were transporting "illegals" to the restaurant. In addition, rather than "innocently advis[ing]" Kwiatkowski about his right not to meet with prosecutors before trial, she suggested that the prosecutors misled her and her friend about the meetings in an effort to waste their time.

In response, Edlind points to the end of the dinner, where she instructed Kwiatkowski to "tell the truth," even if it "hurt" Chujoy. Combined with her trial testimony that she just wanted Kwiatkowski to understand the facts, Edlind contends that no

15

reasonable jury could find that she was conscious of wrongdoing or acting dishonestly. Edlind is incorrect. Although the jury could have believed that she did not corruptly persuade Kwiatkowski because she told him to tell the truth, the jury could also have found that the surrounding circumstantial evidence, combined with Edlind's statements during the dinner, amounted to an attempt to wrongfully and dishonestly influence Kwiatkowski's testimony. As an appellate court, we "are not free to second-guess the jury's choice of one view of the evidence over another." *United States v. Harris*, 821 F.3d 589, 601 (5th Cir. 2016). Edlind's argument is an invitation to adopt a rule that anytime a defendant has, even if with a wink and a nod, reminded the witness to "tell the truth" there is no witness tampering. We "reject" this "invitation to view [Edlind's] words in a vacuum and instead consider the full context in which [her] statement was made." *Sparks*, 791 F.3d at 1192. Here, her statement to Kwiatkowski to "tell the truth" does not negate the circumstantial evidence of conscious wrongdoing and the concerted effort to plant false stories with Kwiatkowski.

In sum, Edlind's statements can be seen as attempts to confuse Kwiatkowski as to what was real and what was Chujoy's odd sense of humor. By confusing Kwiatkowski, Edlind sought to undermine his ability to testify persuasively against Chujoy in the *Inca's Secret* case. Coupled with the circumstantial evidence implicating Edlind—the timing of events following Chujoy's June 3 letter and Edlind's constant attempts at avoiding governmental surveillance—there is sufficient evidence to support the conviction for

witness tampering.[4] The jury was free to reject Edlind's statement to "tell the truth" as a shallow attempt to immunize herself from prosecution.

B.

Edlind also challenges her conviction for obstruction of justice. That statute, in relevant part, provides:

> Whoever . . . corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).

18 U.S.C. § 1503(a) (the omnibus clause). To obtain a conviction under this omnibus clause, the Government must prove beyond a reasonable doubt: "(1) the existence of a pending judicial proceeding; (2) that the defendant had knowledge of the pending proceeding; and (3) that the defendant acted [corruptly] with the intent to influence, obstruct, or impede that proceeding in its due administration of justice." *United States v. Blair*, 661 F.3d 755, 766 (4th Cir. 2011) (internal quotation marks omitted). The Government does not have to prove that Edlind's conduct actually obstructed justice, merely that "the endeavor [has] the natural and probable effect of interfering with the due administration of justice." *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (internal

---

[4] Our conclusion that the Government proffered sufficient evidence of witness tampering effectively decides Edlind's challenge to her conspiracy to commit witness tampering under 18 U.S.C. § 1512(k). That statute does not contain an overt act requirement, so the Government need only prove (1) an agreement between Chujoy and Edlind to tamper with witnesses; (2) knowledge of this conspiracy; and (3) that both knowingly joined the conspiracy to witness tamper. Chujoy's June 3 letter, the multiple jail visits from Edlind, and Edlind's actions after meeting with Chujoy on June 6 are sufficient evidence that the two formed a conspiracy to witness tamper.

17

quotation marks omitted). "Because evidence of intent will almost always be circumstantial, . . . a defendant may be found culpable where the reasonable and foreseeable consequences of [her] acts are the obstruction of justice." *United States v. Brooks*, 111 F.3d 365, 372 (4th Cir. 1997).

We can quickly dispose of several of these elements: there is no dispute that the *Inca's Secret* case was a pending judicial proceeding at the time of the El Charro meal and that Edlind was aware of it. Thus, we must focus on whether Edlind acted with corrupt intent to influence, obstruct, or impede the *Inca's Secret* case. We have already concluded that sufficient evidence supports the jury's verdict that Edlind corruptly persuaded Kwiatkowski, and witness tampering is an attempt to "influence" or "impede" the due administration of justice. *United States v. Kenny*, 973 F.2d 339, 342-43 (4th Cir. 1992) (upholding conviction for obstruction of justice under omnibus clause for tampering with grand jury witness). Accordingly, sufficient evidence supports Edlind's conviction on Count III.

### III.

The district court properly denied Edlind's Rule 29 motion, and its judgment is hereby

*AFFIRMED*.