NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0581n.06

No. 18-3919

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Nov 26, 2019 |
| | ) | DEBORAH S. HUNT, Clerk |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| ADAM CARSON, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |

Before: COLE, Chief Judge; MERRITT and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. A jury found Adam Carson guilty of bank robbery and witness tampering. He was sentenced to 240 months' imprisonment. On appeal, Carson raises a litany of claims—ten in total—challenging his convictions and sentence. Because all lack merit, we AFFIRM.

I.

A federal grand jury charged Carson with one count of bank robbery, in violation of 18 U.S.C. § 2113(a), for robbing a Chemical Bank in Ohio. After the indictment was returned, the government learned that a key grand jury witness, Carson's ex-girlfriend Karin Deeb, had lied during her grand jury testimony by minimizing her own participation in the robbery. Deeb also later admitted that she had been under the influence of drugs during her testimony. The

government, accordingly, sought and received a superseding indictment against Carson; Deeb did not testify during the second grand jury proceedings.[1]

The superseding indictment again charged Carson with one count of bank robbery but added one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(1). The witness tampering count reflected the government's discovery that, after the initial indictment, Carson had written Deeb a letter in an attempt to influence her upcoming trial testimony against him.

After a five-day trial, a jury convicted Carson on both counts. He was sentenced to 240 months' imprisonment on both counts to run concurrently. He appeals his convictions and sentence.

## II.

Carson's appeal raises ten claims of error. We discuss the facts relevant to each claim in conjunction with our analysis thereof.

### A.     Constructive Amendment of the Indictment

With respect to the bank robbery charge, Carson argues that a variation between the language of the indictment and the jury instructions amounted to a constructive amendment of the indictment, in violation of the Fifth Amendment.[2]

---

[1] Deeb later pleaded guilty to one count of aiding and abetting bank robbery and one count of perjury before the grand jury.

[2] Carson also alludes to "prosecutorial misconduct" and to a due process violation related to the indictment. These claims are not sufficiently developed on appeal to have preserved them for our review. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006). Nonetheless, to the extent that Carson is claiming that the district court erred by failing to dismiss the indictment because it was procured based on Deeb's perjured testimony, the claim fails. A superseding indictment in a criminal case replaces the earlier indictment and "becomes the only indictment in force." *United States v. Goff*, 187 F. App'x 486, 491 (6th Cir. 2006). The superseding indictment here was obtained without Deeb's testimony, so there was no error in proceeding on the superseding indictment. To the extent that Carson is claiming that the government knowingly

"A constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *United States v. Pritchett*, 749 F.3d 417, 428 (6th Cir. 2014) (quoting *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007)). We have held that such amendments are "considered per se prejudicial and warrant[] reversal of a conviction" because they directly infringe upon the Fifth Amendment grand jury guarantee. *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989). "We review de novo the legal question of whether an indictment has been constructively amended by . . . jury instructions." *Pritchett*, 749 F.3d at 428.

The superseding indictment charged that Carson took the property of Chemical Bank "by force, violence, *and* intimidation." (Emphasis added). But, over Carson's objection, the district court instructed the jury that it could convict upon proof that Carson took the money by "force and violence *or* by intimidation." (Emphasis added). The difference, Carson asserts, amounted to a constructive amendment of the indictment and improperly reduced the number of elements required to convict him. We disagree.

When a statute defines elements of an offense in disjunctive terms, the jury may be instructed in those terms, even if the indictment charged the elements conjunctively. *United States v. McAuliffe*, 490 F.3d 526, 534 (6th Cir. 2007). We have explained that phrasing indictments in the conjunctive permits "confiden[ce] that the grand jury has found probable cause for all of the alternative theories that go forward." *United States v. LaPointe*, 690 F.3d 434, 440 (6th Cir. 2012).

procured the perjurious testimony supporting the first indictment, there is no evidence of that in the record, and, again, no such testimony supported the superseding indictment.

But petit juries "may convict a defendant on any theory contained in the indictment. As a result, judges read jury instructions in the disjunctive." *Id.* Here, Carson rightly admits that "[t]he requirement of a taking by 'force and violence or intimidation' under 18 U.S.C. [§] 2113(a) is *disjunctive*." Appellant's Br. at 10 (emphasis in original). Therefore, no constructive amendment occurred; the superseding indictment charged Carson in the conjunctive, but the statute and the jury instructions were in the disjunctive. Carson's argument fails.

## B.    Career Offender Enhancement

Carson next argues that the district court erred when it calculated his sentence using a career-offender enhancement. *See* U.S.S.G. § 4B1.1. Specifically, he argues that his prior convictions for robbery in Ohio do not qualify as crimes of violence under the Sentencing Guidelines. *See* U.S.S.G. § 4B1.2(a) (2016). We review de novo whether an offense constitutes a crime of violence under the Guidelines. *United States v. Cooper*, 739 F.3d 873, 877 (6th Cir. 2014).

In 2006, Carson was convicted of robbery in the second degree, in violation of the "Post-Senate Bill 2"[3] version of Ohio Revised Code (ORC) § 2911.02(A)(2), which states that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall . . . [i]nflict, attempt to inflict, or threaten to inflict physical harm on another." In 2009, he was convicted of two counts of the same offense. Carson argues that, under *Gates v. United States*, No. 17-3156, 2018 U.S. App. LEXIS 4075 (6th Cir. Feb. 20, 2018), and *United*

---

[3] "In 1996, Ohio Senate Bill 2 significantly modified Ohio's criminal code." *See Greer v. United States*, 938 F.3d 766, 771 (6th Cir. 2019) (internal quotation marks omitted). We commonly refer to the old version of the code as "Pre-Senate Bill 2" and the current version as "Post-Senate Bill 2." *Id.* Carson's convictions occurred in 2006 and 2009, under the Post-Senate Bill 2 version of the code.

*States v. Yates*, 866 F.3d 723 (6th Cir. 2017), his Ohio robbery convictions do not qualify as crimes of violence.

Our precedent squarely forecloses this argument. *See United States v. Johnson*, 933 F.3d 540, 546 (6th Cir. 2019). In *Johnson*, we declined to extend our holding in *Yates*, which *Gates* relied upon, to Carson's offense of conviction—§ 2911.02(A)(2) (Post-Senate Bill 2). *Id.* at 545–46. *Yates* held that a robbery conviction under a different statutory provision—ORC § 2911.02(A)(3) (Post-Senate Bill 2)—was not a crime of violence under the Guidelines. 866 F.3d at 728–31. But in *Johnson*, we concluded that *Yates*'s logic did not apply to ORC § 2911.02(A)(2) (Post-Senate Bill 2). 933 F.3d at 545–46. We explained that a conviction under (A)(3) requires only that "force" be attempted, threatened, or deployed, whereas a conviction under (A)(2) requires that a person inflict, attempt to inflict, or threaten to inflict "physical harm." *Id.* Drawing a distinction between attempted, threatened, or deployed "force" and "physical harm," we held that a conviction for Ohio robbery under § 2911.02(A)(2) (Post-Senate Bill 2) qualifies as a crime of violence. *Id.* at 543–46. Our precedent therefore forecloses Carson's claim. The district court correctly sentenced Carson as a career offender under the Guidelines because Carson had three prior convictions for attempted robbery in violation of ORC § 2911.02(A)(2) (Post-Senate Bill 2). *See Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 770 (6th Cir. 2004).

### C.     Ineffective Assistance of Trial Counsel

Carson next claims that his trial counsel, Donald Butler, provided him with constitutionally ineffective assistance. We do not ordinarily review claims of ineffective assistance on direct appeal. *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006). Ineffective assistance claims are more properly raised in post-conviction proceedings where the record may be developed

in more detail. *Id.* Thus, any review on direct appeal is limited to "rare cases where the error is apparent from the existing record." *Id.* This is not one of those rare cases.

The alleged ineffectiveness of Carson's trial counsel is not apparent from the record. Indeed, the appellate briefing does not define with any precision just what Carson thinks Butler did wrong; nor does it make any attempt to explain how Butler's alleged errors caused him harm. Both showings are required to prevail under *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Carson argues, in conclusory terms, that Butler "ignored Appellant's requests and strategies regarding his case"; failed to object to mentions of Carson's criminal record and prior bad acts during trial; conceded, in his opening statement, that Carson took a car that he did not own; and failed to accept a plea deal that Carson had instructed him to accept. But he offers little elaboration and does not explain how any of these actions, in the context of the trial, fell below the standard of care of a reasonably prudent attorney under the circumstances. *Id.* at 688. And Carson makes no mention at all of how, but for these errors, the result of the trial would have been different. *Id.* at 694–96. We decline to entertain these poorly developed claims on direct appeal.

D.    Motion to Substitute Counsel

Carson next argues that the district court violated his Sixth Amendment rights by denying his motion to substitute counsel. We disagree. While the Sixth Amendment guarantees criminal defendants the right to counsel, an "indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." *United States v. Iles*, 906 F.2d 1122, 1130–31 (6th Cir. 1990). We review the district court's "good cause" determination for abuse of discretion. *United States v. Marrero*, 651 F.3d 453, 464 (6th Cir. 2011).

A week after Carson was indicted, the court appointed Butler to represent him. Approximately six months later, Carson moved for substitute counsel, alleging that Butler was unresponsive and had failed to file motions, issue subpoenas, and contact witnesses. The district court denied his motion, noting that Butler was "an outstanding trial [counsel] w[ith] over 40 years [of] experience." In its order, the court informed Carson that if he wanted new counsel, he could retain his own.

At a competency hearing about six months later, Carson expressed his continued dissatisfaction with Butler on the same grounds. The district judge explained that Carson could hire whomever he wanted and again stated that he had known Butler for over thirty-five years and found him to be one of the best, if not the best, criminal defense lawyers in Northern Ohio. The district court judge was not aware of any similar complaints being lodged against Butler. Accordingly, the court advised Carson to work with Butler on any outstanding legal issues.

Carson persisted, though, expressing his concerns about Butler through the remainder of the competency hearing. In response, Butler addressed Carson's allegations, calling them erroneous. Butler explained that he had communicated with Carson several times while Carson was in Florida being evaluated for competency to stand trial. Butler also explained that Carson seemed to have an unrealistic view of how quickly his trial would proceed. Carson had sent Butler his own drafts of motions that Carson wished Butler to file right away. Butler explained that he had told Carson, "there is a time-based issue here, and that when he return[ed] from Florida [they would] go over all these motions and determine which ones have value and which ones do not, and [they would] proceed accordingly." Carson responded by asking the judge if he could "go pro se"; the judge responded that Carson could file a motion. Carson then added, "I need an attorney, but I don't need him, because he hasn't done a thing."

Days later, Carson filed a pro se motion to dismiss counsel. Carson presented the same reasons set forth in his first motion to substitute counsel but added the charge that "Butler's mental capacity seems to be diminishing," alleging that Butler "may be in the early stages of Dementia or Alzheimer's Disease." The district court denied his motion.

Less than one month before trial was originally scheduled to begin, Carson filed yet another pro se motion, this time requesting to represent himself at trial and asking the court to hold a hearing on his motion "as soon as possible." One week before trial, the court addressed Carson's motion at a pre-trial hearing. When asked about the merits of his motion to proceed pro se, Carson instead began discussing Deeb's false grand jury testimony. The district court explained that the hearing on the self-representation motion was not the time to raise issues concerning a trial witness's testimony; and Butler explained that he "ha[d] informed Mr. Carson that all of this will come out on cross-examination." The district court then redirected the conversation to the question of self-representation, explaining that Carson needed to decide whether he wanted to represent himself or whether he wanted Butler to do so. Carson responded that he did not "have the resources . . . to even attempt to make an adequate defense" and that it would be better to have Butler because he knows the rules of evidence. The government asked the district court to clarify whether Carson wanted to represent himself or not. The district court said it was clear that Carson wished to have Butler represent him. Carson did not object.

Carson filed his last motion to dismiss counsel one month before his new trial date. This time, he cited medical reasons for wanting to dismiss Butler, who was ill and had to be hospitalized. The court held a hearing and determined that Butler's health would not prevent him from continuing his representation, so long as a continuance was granted. The court then granted a continuance and denied Carson's motion to dismiss counsel.

To determine whether the district court abused its discretion in denying the motion to substitute counsel, we consider the following factors:

> [1] the timeliness of the motion; [2] the adequacy of the court's inquiry into the defendant's complaint; . . . [3] whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense[; and] [4] a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.

*Marerro*, 651 F.3d at 464 (alterations in original) (quoting *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996)).

We need not linger long on timeliness. The government concedes that two of Carson's motions to substitute counsel—filed two months before the August 14, 2017 trial date and two months before the March 5, 2018 trial date—were timely. Although his last motion, filed twenty-eight days before the June trial date, was untimely, *see United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006) (finding a motion to substitute counsel filed a month and a half before trial untimely); *see also United States v. Fonville*, 422 F. App'x 473, 480 (6th Cir. 2011) (finding a motion to substitute counsel filed twenty-two days before trial untimely), we find that timeliness cuts in favor of Carson. This is not a case in which the defendant brought last-minute motions to substitute counsel after awaiting trial for months without any complaints about his counsel's representation. *See Marrero*, 651 F.3d at 465.

The second factor is the adequacy of the district court's inquiry. *Id.* at 464–66. We have deemed this requirement met when the district court allows a defendant the opportunity to explain the attorney-client conflict as he perceives it. *See, e.g.*, *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009) ("The record demonstrates that the district court engaged in multiple lengthy discussions with both [the defendant] and [his counsel] that span many transcript pages regarding their alleged conflicts. During these exchanges, [the defendant] had ample opportunity to discuss

in detail his complaints regarding [his counsel] and respond to [his counsel]'s representations regarding their relationship.").

Here, Carson had an opportunity to address the court about his representation concerns at the competency hearing on December 27, 2017, and during the final pre-trial hearing on April 3, 2018. As detailed above, Carson explained his concerns with Butler's lack of communication and his failure to file the motions that Carson had sent him. The court also heard Butler's response, which explained Carson's unrealistic expectations regarding the speed of litigation and his mistaken impression that any issue could be raised at any time. Butler explained that he had told Carson he would review Carson's draft motions and that the two would discuss their merits and proceed accordingly at the appropriate time. The district court explained that Butler had a good reputation as a defense attorney and that the court believed him to be able, had heard no similar complaints against Butler, and found Carson to be "a little bit impulsive." In the end, the court instructed the two to discuss Carson's motions and continue working together. Because Carson had opportunities to explain the attorney-client conflict as he perceived it and to engage in a discussion with the court and his counsel about the alleged conflict, we find that this factor weighs against Carson.

The third factor is the extent of the conflict between Carson and Butler. *Marrero*, 651 F.3d at 464, 466–67. Carson cites various reasons for the conflict, including a lack of communication, irreconcilable differences, Butler's refusal to subpoena witnesses or file Carson's motions, and Butler's failure to obtain experts. Carson also cites Butler's alleged "diminish[ed]" "mental capacity" as a conflict. But his main complaint appears to be that Butler had not yet done enough to point out to the court that Deeb had lied in her grand jury testimony. Carson, for example, expressed concern about Butler's failure to file Carson's pro se motion to dismiss the indictment,

which Carson apparently, but erroneously, believed had been procured with Deeb's false testimony. Butler, however, had advised Carson that he would have an opportunity to cross-examine Deeb at trial and that pre-trial hearings were not the appropriate time to challenge her testimony. He further assured Carson that he would review Carson's motions and determine which ones had value and proceed accordingly.

We cannot say that the district court abused its discretion in determining that substitute counsel was not warranted. We have emphasized that "a defendant's differences of opinions with his attorney do not create a complete breakdown of communication that compromises his defense." *Marerro*, 651 F.3d at 466. Rather, any conflict must be "so great that it resulted in a total lack of communication preventing an adequate defense." *Id.* We see no such breakdown of communication here. This factor weighs against Carson.

Lastly, we balance these factors with the public's interest in the prompt and efficient administration of justice. *Id.* at 464, 467–68. After reviewing Butler's background, experience, and work on the case to date, and giving due regard to Carson's concerns, the district court found no grounds to substitute counsel. Despite Carson's disagreements with Butler's approach to the case, there is nothing in the record to suggest that either Carson or his lawyer was unprepared to go forward with the trial; they simply disagreed about how it should be conducted. Butler, who was up-to-date with the nuances of Carson's case, sought multiple continuances to allow proper time to complete discovery and prepare for trial; although Carson's motions were timely, substitution of counsel two months before trial would have necessitated additional continuances. By that time, Butler and the prosecutor had invested substantial time and effort into trial preparation. The public's interest in the prompt and efficient administration of justice weighs in favor of proceeding with the trial.

While the timeliness of Carson's motions to substitute counsel weighs in his favor, the three remaining factors support the district court's ruling. The district court did not abuse its discretion in denying Carson's requests for substitute counsel.

### E. Right to Self-Representation

Carson next argues that the district court violated his Sixth Amendment right to self-representation.[4] "Decisions denying a defendant's request for self-representation have been reviewed *de novo* and for abuse of discretion." *United States v. Powell*, 847 F.3d 760, 774 (6th Cir. 2017). We need not decide the proper standard here because Carson's claim fails under either one.

The Sixth Amendment guarantees a criminal defendant the right to counsel. In *Faretta v. California*, the Supreme Court recognized a corollary right to waive counsel and proceed pro se. 422 U.S. 806, 833–34 (1977). But, as in *Faretta*, the defendant's assertion of the right to self-represent must be clear, unequivocal, and timely. *See id.* at 835; *see also United States v. Cromer*, 389 F.3d 662, 682 (6th Cir. 2004) ("*Faretta* procedures are only required when a defendant has clearly and unequivocally asserted his right to proceed *pro se*"). Carson's request was neither clear nor unequivocal, and so we need not decide whether it was timely.

---

[4] Carson also argues that the district court erred by failing to inform him that he could "represent himself and be appointed advisory counsel." It is unclear what Carson is claiming. "[H]e has no constitutional right to demand 'hybrid representation,' such as conducting his own defense with the occasional assistance of counsel." *Wilson v. Hurt*, 29 F. App'x 324, 327 (6th Cir. 2002); *see also United States v. Green*, 388 F.3d 918, 922 (6th Cir. 2004). If instead Carson is objecting that the court did not offer him standby counsel, should he elect to represent himself, he cites no authority suggesting that such an offer is constitutionally required, while ample authority suggests the opposite. *See, e.g.*, *United States v. Bova*, 350 F.3d 224, 226 (1st Cir. 2003); *United States v. Moya-Gomez*, 860 F.2d 706, 740 (7th Cir. 1988); *McQueen v. Blackburn*, 755 F.2d 1174, 178 (5th Cir. 1985). And, in any event, the district court did inform Carson that if he wished to represent himself, then Butler would still be present.

Carson requested to proceed pro se at a competency hearing on December 27, 2017, and was instructed by the district court to file a motion. Carson responded, "I need an attorney, but I don't need [Butler], because he hasn't done a thing." Carson later filed a motion to proceed pro se, which recited that his "waiver of counsel [wa]s clear, unequivocal, knowing and voluntary." But, at a hearing on the motion, when asked whether he would like to proceed pro se, Carson said it would be better to have Butler. When the prosecution asked for clarification, the court said it was clear that Carson wanted Butler to represent him. Carson did not object.

After the hearing, Carson continued to express his desire for representation by counsel, stating that if Butler could not proceed due to medical issues, Carson would waive his speedy trial rights to allow appointment of new counsel. Carson's assertion of his *Faretta* rights was anything but clear and unequivocal. His argument, therefore, fails.

### F.      Right to be Present

Carson next argues that he was denied his Fifth Amendment right to be present at a critical stage of the proceeding. "[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). This means that a defendant's right to be present exists only when "his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *United States v. Henderson*, 626 F.3d 326, 343 (6th Cir. 2010) (quoting *United States v. Brika*, 416 F.3d 514, 526 (6th Cir. 2005)). Rule 43 of the Federal Rules of Criminal Procedure states that a defendant ordinarily must be present during the initial appearance, arraignment, and plea; at each stage of the trial, including the jury impanelment and the return of the verdict; and during sentencing. Fed. R. Crim. P. 43(a). By

contrast, a defendant need not be present at a "conference or hearing on a question of law." *Id.*
43(b)(3).

Carson claims he had a right to be present on the morning of trial when his counsel moved
to exclude bank teller Mylissa Johnson's identification of Carson. Though not present when Butler
first placed the issue on the record, Carson was brought into the courtroom less than five minutes
later, during arguments on the motion. Following these arguments, the court denied the motion,
admitted the testimony, and made clear that Butler would have the opportunity to cross-examine
Johnson about her identification. The trial transcripts reveal that Carson was present for this ruling.
When the jury returned, the prosecution called Johnson to testify. Butler then cross-examined her
about the identification. Carson was present for this, as well.

Because Carson did not object below, we review his claim for plain error. *United States v.
Burke*, 345 F.3d 416, 420 (6th Cir. 2003). Plain error review involves four steps:

> First, there must be an error or defect—some sort of [d]eviation from a legal rule—
> that has not been intentionally relinquished or abandoned, *i.e.,* affirmatively
> waived, by the appellant. Second, the legal error must be clear or obvious, rather
> than subject to reasonable dispute. Third, the error must have affected the
> appellant's substantial rights, which in the ordinary case means he must
> demonstrate that it affected the outcome of the district court proceedings. Fourth
> and finally, if the above three prongs are satisfied, the court of appeals has the
> *discretion* to remedy the error—discretion which ought to be exercised only if the
> error seriously affect[s] the fairness, integrity or public reputation of judicial
> proceedings.

*Puckett v. United States*, 556 U.S. 129, 135 (2009) (alterations in original) (internal citations and
quotation marks omitted). Carson has not shown that his partial absence from the evidentiary
discussion affected his substantial rights. *See Bourne v. Curtin*, 666 F.3d 411, 413 (6th Cir. 2012)
(stating that the "right to personal presence at all critical stages of the trial" is "generally subject
to harmless-error analysis") (internal quotation marks omitted) (quoting *Rushen v. Spain*, 464 U.S.

114, 119 n.2 (1983) (per curiam)). Therefore, we need not examine the other prongs of the plain error test.

Carson claims he was harmed by missing five minutes of the arguments on the motion to exclude the bank teller's identification because his attorney "did not tell [him] about this alleged identification," and he only learned of his attorney's "attempt[] to cover it up" when he received the transcripts of the trial. Carson claims that if he had been "in the courtroom when Mr. Butler addressed the court about the bank teller's identification, he could have let the court know that his [a]ttorney did not share this information with him and a mistrial could have been declared."

Leaving aside the question whether a mistrial would have been proper in such circumstances, the record belies Carson's claim of harm. Carson was present for a portion of the arguments on the motion to exclude Johnson's identification testimony, for the court's ruling on that motion, and for the entirety of Johnson's testimony and cross-examination. It cannot be true, therefore, that Carson was unaware of the teller's identification (or his attorney's alleged failure to inform him of it) until he received the trial transcripts. Carson has not, therefore, shown any harm to his substantial rights from his brief absence from the courtroom.

### G.  Admission of Identification Testimony

Carson next argues that the trial court's admission of Johnson's identification testimony violated his right to due process. Johnson testified that she recognized Carson as the robber when, "a few weeks after the robbery," one of the other bank tellers showed her Carson's Facebook photo.

As Carson acknowledges, "[t]he Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as

unworthy of credit." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). No one disputes that Carson was allowed to cross-examine Johnson regarding her identification testimony during trial.

Yet, the preference for cross-examination notwithstanding, the Supreme Court has held that due process may "require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was . . . procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 248. The difficulty for Carson is identifying any way in which law enforcement influenced Johnson's testimony. For example, it is undisputed that the police never showed Johnson a photograph of Carson. Carson tries to find police involvement by speculating that the police must have told Johnson, or other bank employees, that Carson was a suspect prior to his indictment. That information, Carson further surmises, prompted Johnson's co-worker to find Carson's Facebook photo and show it to Johnson. We are skeptical that, even if true, providing such information would amount to the kind of "unnecessarily suggestive circumstances arranged by law enforcement" that would violate due process, *id.*, but we need not decide because there is no record support for such a claim.

Carson claims that the "only way" Johnson could have truthfully testified that she had learned a few weeks after the robbery that Carson was a suspect "is if law enforcement disclosed this information to bank employees." This is true, he says, because the U.S. Attorney's Office did not issue a press release about Carson's arrest until more than seven weeks after the robbery. But a manager at Chemical Bank testified that a local news website had released an article naming Carson as a suspect a week or so after the robbery. And there is simply no other evidence in the

record that suggests any law enforcement role in Johnson's identification of Carson. Accordingly, the district court did not deny Carson due process by admitting Johnson's identification testimony.[5]

### H. Fourth Amendment Claims

Carson briefly asserts that his Fourth Amendment rights were violated when authorities searched his jail cell and his mother's house and seized Jencks material found there.[6] A protective order issued by the district court demanded the return of Jencks material Butler had left with Carson in his jail cell in advance of trial. The government sought this protective order when it learned that Carson had unlawfully mailed the Jencks material to his mother and had asked her to copy it for dissemination to the media and various civil rights organizations. The Jencks material contained personal identifying information of third parties as well as a report of an unrelated incident about Deeb.

To the extent Carson complains about the legality of the searches, we note that the search of the jail cell was authorized by the protective order; moreover, Carson makes no claim contesting probable cause to conduct either search. Indeed, with respect to the search of his mother's house, Carson admits that "[t]he government knew that Appellant's mother had copies of the incriminating documents from a phone call he made to her from the jail." More fundamentally, however, Carson has not established his standing to challenge the search of his mother's home.

---

[5] Carson also claims that his trial counsel performed inadequately when he failed to rebut Johnson's testimony with evidence that there are many Facebook profiles listed for "Adam Carson" and when he failed to present evidence showing the security settings on Carson's Facebook account, which Carson claims would not have let a stranger view his photo. Those claims, like his other claims of ineffective assistance, are not fit for our resolution on direct appeal, but are better suited to a petition filed pursuant to 28 U.S.C. § 2255. *See Lopez-Medina*, 461 F.3d at 737.

[6] Pursuant to the Jencks Act, 18 U.S.C. § 3500, the prosecution must supply the defense with previous statements or reports made by government witnesses, but only after the witness has testified at trial.

He has not for example, attempted to show that he also lived there, *see Bumper v. North Carolina*, 391 U.S. 543 (1968), and he can claim no reasonable expectation of privacy in the Jencks material he mailed to her, *see United States v. King*, 55 F.3d 1193, 1196 (6th Cir. 1995) ("[I]f a letter is sent to another, the sender's expectation of privacy ordinarily terminates upon delivery.").

Similarly, Carson has no reasonable expectation of privacy in his jail cell. *See Hudson v. Palmer*, 468 U.S. 517, 530 (1984) ("[P]risoners have no legitimate expectation of privacy and . . . the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells."); *see also United States v. Smith*, 526 F.3d 306, 309 (6th Cir. 2008) ("[I]nmates . . . have no legitimate expectation of privacy from searches of their prison cells."). To the extent that Carson argues he was deprived of materials taken from his cell that were not Jencks material, the record reflects otherwise. Discussing the seized material, the government informed the court, in Carson's presence, that "[a]ll of the material that was reviewed, if it had nothing to do with Jencks, it was returned to Mr. Carson. Anything that was actual Jencks material turned over to him prior to the previous trial date was placed in an envelope and returned to Mr. Carson before [the court] started trial in this matter." Carson did not object then and presents no evidence suggesting otherwise now. Carson's Fourth Amendment claims fail.

I.      Federal Rule of Evidence 404(b)

Carson next asserts that the district court violated Federal Rule of Evidence 404(b) by allowing his parole officer to testify, which, by definition, "insinuate[d] prior conviction." But the parole officer never identified himself as such, instead testifying that he worked at "[a] state agency." And his testimony made no mention of Carson's prior convictions. Carson also alludes to 404(b) violations in the form of "mention of auto theft, drug paraphernalia, and booking photos." But he provides no meaningful argument to support this claim. It is well settled that "issues

adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]." *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)). Our inquiry into these Rule 404(b) challenges, accordingly, ends here.

## J. Sufficiency of the Evidence

Carson's final argument is that the jury lacked sufficient evidence to support a conviction for witness tampering. We review the district court's denial of a motion for judgment of acquittal de novo. *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016). We are to draw "all reasonable inferences in support of the jury's verdict and will reverse a judgment for insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole." *Id.* (quoting *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013)). "'Substantial evidence' is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Id.* (quoting *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015)). The defendant raising a sufficiency of the evidence claim bears a "very heavy burden." *Id.* (quoting *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015)).

The government sought to prove that Carson had engaged in witness tampering with respect to Deeb, under 18 U.S.C. § 1512(b)(1), by attempting to "(1) corruptly persuade (2) a witness in an official federal proceeding (3) with the intent to influence that witness's testimony." *United States v. Burns*, 298 F.3d 523, 540 (6th Cir. 2002).

After Deeb had testified before the first grand jury, Carson sent Deeb a six-page letter, dated March 12, 2017. Deeb read the letter to the jury while on the stand. In a portion of the letter, Carson said:

> My lawyer claims the only thing they have against me (for something I didn't do)
> is you. If you go on the stand, your character will be assassinated—especially

because of the situation you got yourself in. Everything that ever happened in the past will come out. The best thing for you to do, to make things right, is to either explain the detectives pressured you into saying s\*\*\* or plead the 5th Amendment (right to not incriminate self).

When Deeb was asked how she interpreted this language, Deeb said that she understood it as a threat. Carson asked Deeb to "make things right" four times in his letter; Deeb interpreted this to be a request for her to lie and say he was not part of the bank robbery. In another portion of the letter, Carson explained that he had told detectives that, on the day of the bank robbery, he had been driving with Deeb playing Pokemon GO. Deeb testified that she interpreted this to mean Carson hoped that she would corroborate his story and lie about where she had been on the day in question. Later in the letter, Carson discussed his trial, noting that if he won, he would be free. He said, "If you make thing[s] right, and I'm out, I will help you any way I can." He also said, "If you really did love me, prove it." Deeb interpreted this language to mean that Carson would help her with anything—"money on [her] books, commissary"—if she would help him "get away from this bank robbery charge."

Carson argues that the government failed to prove that he "corruptly persuaded" Deeb. We have previously upheld convictions for witness tampering based on "corrupt persuasion" where the defendant encouraged a witness to lie. *See Burns*, 298 F.3d at 540 ("Burns attempted to 'corruptly persuade' Walker by urging him to lie about the basis of their relationship, to deny that Walker knew Burns as a drug dealer, and to disclaim that Burns was Walker's source of crack cocaine."); *see also United States v. Montgomery*, 358 F. App'x 622, 629–30 (6th Cir. 2009) (concluding that the evidence was sufficient to sustain conviction for corruptly persuading a witness where the defendant sent letters to another urging him to lie about their relationship, to deny he knew the defendant as a drug dealer, and to say the defendant was not the source of his cocaine). Courts in other circuits have done the same. *See, e.g.*, *United States v. Bedoy*, 827 F.3d

495, 510 (5th Cir. 2016) (concluding that the evidence sufficed to show "corrupt persuasion" when defendant suggested that witness misrepresent their relationship to conceal wrongdoing). Surveying the landscape, the Fourth Circuit put the point directly: Whatever the "outer limits" of the conduct captured by the phrase "corruptly persuades," "[a] defendant's directive to a witness to lie to investigators or at trial always suffices." *United States v. Edlind*, 887 F.3d 166, 173–74 (4th Cir. 2018).

Carson, however, says that the government did not establish corrupt persuasion because Deeb admitted that Carson had not "sa[id] in that letter" or "ever"—"lie for me." But Deeb also testified that she believed Carson wrote the letter because he wanted her "to lie and say that he was not part of the bank robbery." Thus, although Carson may not have expressly asked Deeb to lie, she nonetheless understood his letter as such a request. We do not think § 1512(b)(1) requires that a defendant directly state his request that a witness lie. There was sufficient evidence here, including Deeb's own impression of the letter, from which a reasonable jury could find beyond a reasonable doubt that Carson had asked Deeb to lie, which is to say that he "corruptly persuaded" her. As Carson meaningfully challenges only the "corrupt persuasion" element of his witness tampering conviction,[7] his sufficiency claim fails.

* * *

For the reasons set forth above, we AFFIRM the judgment of the district court.

---

[7] Carson also states, "As for the second element, Appellant was incarcerated so it was not possible for him to prevent or delay Ms. Deeb's testimony." But under § 1512(b), an attempt to "influence . . . the testimony" of a witness suffices; the defendant need not also "delay, or prevent" the testimony. 18 U.S.C. § 1512(b). As discussed above, the jury could reasonably find that Carson tried to get Deeb to lie on the stand, which is to say that he tried to "influence" Deeb's testimony. "As for the third element," Carson states, without elaboration, that "no overt act was ever committed." But the government rightly notes that § 1512(b)(1) requires no "overt act" and "[e]ven if it did, sending the letter to Deeb" would surely suffice.